STATE of Minnesota, Respondent,

v.

Joseph Leander RAINER, Appellant.

No. C6–86–1232.

Supreme Court of Minnesota.

Aug. 21, 1987.

J. Christopher Cuneo, James M. Lockhart, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, John E. MacGibbon, Sherburne Co. Atty., Elk River, Kim Brandell, Thomas N. Price, Asst. Sherburne Co. Attys., Elk River, for respondent.

WAHL, Justice.

Joseph Rainer was convicted of murder in the first degree in connection with the shooting death of Marla Forrest in violation of Minn.Stat. § 609.185(1) (1986) after a jury trial from April 22 to May 7, 1986, and was sentenced to life imprisonment. He appeals on four grounds: intrusion by a state investigator into the activities of the defense's expert witness; sufficiency of the evidence; the admission of *Spreigl* evidence; and the denial of a *Schwartz* hearing. We affirm the conviction.

Defendant and Marla Forrest had known each other since the summer of 1983 when Forrest began taking her car to defendant's gas station. The two spent time together and defendant wanted to get married, but Forrest was not prepared to make a commitment. Within the last two weeks before the shooting Forrest told friends that she planned to terminate the relationship.

On October 27, 1984, Forrest went to defendant's house so that he could replace the engine in her car. Her 9-year-old son Tobi went along. During the afternoon Forrest and defendant talked and drank beer, while Tobi amused himself. Forrest sounded normal and cheerful when her father telephoned and she told him that she would use defendant's car to get home. At one point during the afternoon Tobi heard an argument between Forrest and defendant.

At the end of the afternoon as Forrest was leaving, defendant walked her out to the car. According to the account of the incident defendant gave the police, he picked up a single shot 12-gauge shotgun that he had left lying in the breezeway, tucked it under his arm, and it accidentally fired, hitting Forrest in the back. He said that he had been shooting squirrels that morning and had left the gun in the breezeway and that he picked it up to get it out of the mist. Defendant's former wife, Maxine, testified that defendant made a habit of keeping his guns loaded. Tobi said that the gun was not in the breezeway but in the living room, leaning against the wall near the gun case. Defendant's tenant said that he did not remember seeing a gun in the breezeway when he walked through the breezeway in the early afternoon.

Medical evidence indicated that Forrest was shot in the back from one to two feet away at a downward angle of between 10 and 20 degrees. The wound was 44½ inches from Forrest's bare feet, and her boots added another 1¾ to 2 inches. Defendant measured between 47⅜ inches and 53 inches from stocking foot to armpit (measurements at different times yielded different results); his boots added another 1¾ inches. The downward angle and the measurements of the two bodies were relevant to the question of whether the gun was under defendant's arm when it went off, as he claimed, or whether it was at his shoulder, a normal position for intentional firing, as the state hypothesized.

Expert testimony concerning the gun established that the gun required cocking before firing, though it had no other safety device, and that a moderate to heavy amount of force was needed for pulling the trigger. The gun would not discharge

without the trigger being pulled when it was tested by dropping it or striking it with a rubber mallet when it was cocked. No tests were made concerning pulling the gun along clothing, though the expert agreed that the gun could be cocked by catching it on clothing. The expert did not comment on whether the trigger could be pulled by drawing it across clothing.

The issues raised on appeal are:

1. Whether there was intrusion by the state on activities of the defense's expert firearms witness in violation of the defendant's rights.

2. Whether the jury's verdict of first degree murder is supported by the evidence.

3. Whether the trial court erred in admitting evidence of prior bad acts.

4. Whether the trial court erred in refusing to grant a *Schwartz* hearing on alleged jury misconduct.

1. Defendant argues that a state investigator injected his presence into the testing being done by a defense expert, in violation of defendant's sixth amendment right to counsel, his fourteenth amendment right to due process and a fair trial, and the rules of discovery, and further that the state did not release the investigator's report for more than three weeks, in violation of the rules of discovery.

The case had been continued at the request of defendant's attorney so that the defendant could retain Richard Thompson, a Wisconsin firearms expert, to do testing on the gun. An investigator with the Sherburne County sheriff's department, Ferdinand Trebesch, took the gun to Thompson in Oregon, Wisconsin, and stayed to observe the testing with the consent of Thompson. Trebesch, in his report of his observations of the procedures used by Thompson, quoted Thompson as saying some very negative things about the defendant's story, particularly with regard to the angle of the wound and the position in which the gun was held. Trebesch's report also indicated that Thompson had played a videotape of the sheriff's department's re-

construction of the incident which Trebesch had taken with him.

Defense expert Thompson's report focused primarily on the question of the possibility of accidental discharge. His tests indicated that the gun would fire when hit on the bottom of the pistol grip when cocked, but not when hit elsewhere or dropped. He also commented on the extremely heavy recoil. He estimated that the shot which killed Forrest was fired from a distance of between 6 and 24 inches. He mentioned in his report that his estimate was based in part on conversation with Investigator Trebesch. The report did not refer to the angle of the shot.

Thompson discussed his findings with defendant's attorney and wrote a report, dated April 8, 1986, which the defense received on April 15th and which was delivered to the state on April 16, the day before trial began. On April 17, voir dire of prospective jurors indicated that the defense intended to call a ballistics expert from Wisconsin. On that date, Trebesch's report, dated March 24, was given to defense counsel. Defense counsel moved for a mistrial, a continuance, or a ruling that the state could not use the evidence. The trial court denied the mistrial and continuance and denied at that time the motion on restriction of the state's use of the evidence, leaving open the option for the defense to raise the issue again later in the trial.

■■■ The sixth amendment right to effective assistance of counsel protects the defendant's relationship to a defense expert witness.

[I]t is essential that [the defense attorney] be permitted full investigative latitude in developing a meritorious defense on his client's behalf. This latitude will be circumscribed if defense counsel must risk a potentially crippling revelation to the state of information discovered in the course of investigation which he chooses not to use at trial.

*State v. Mingo*, 77 N.J. 576, 582, 392 A.2d 590, 592 (1978). However, here there is little basis for a sixth amendment claim. Thompson apparently gave information voluntarily to the state investigator. An in-

vestigator is permitted to talk to a potential witness, without a *Miranda* warning, and the witness is free to refuse to talk. Trebesch was not present by subterfuge or disguise, as was Weatherford in *Weatherford v. Bursey*, where an undercover agent sat in on a defense meeting because he had been arrested at the same time as the defendant. 429 U.S. 545, 547, 97 S.Ct. 837, 839, 51 L.Ed.2d 30 (1977). Further, Trebesch's information was not used at trial. *See United States v. Brugman*, 655 F.2d 540, 546 (4th Cir.1981). Nor is there any indication that the defense expert was influenced in his conclusions by his conversations with the state investigator or by the state's videotaped re-enactment of the incident. While it would have been preferable that a state investigator not be present to observe defense tests, to hear unguarded comments, and to discuss the case with the expert before the expert formulated conclusions, the presence of the state investigator in this case does not rise to the level of a sixth amendment problem.

■ Defendant's next contention is that late disclosure of Trebesch's report constituted a violation of the rules of discovery. Trebesch's report was delivered on April 17, three and a half weeks after it was written but only one day after Thompson's report was received by the prosecution. We have held that failure of the prosecution to release a statement by a defense witness and use of the statement at trial to impeach the witness require reversal of a conviction. *State v. Schwantes*, 314 N.W.2d 243, 244–45 (Minn.1982). However, in defendant's case the statement was disclosed before trial and was not used to impeach the witness as the witness was not called. The lateness of the disclosure was not a serious discovery violation and no prejudice has been demonstrated. *See State v. Galvan*, 374 N.W.2d 269, 270 (Minn.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1496, 89 L.Ed.2d 897 (1986).

■ Defendant also argues that the trial court erred in refusing to grant a continuance. Ruling on a request for a continuance is within the trial court's discretion and a conviction will not be re-versed for denial of a motion for a continuance except when such denial is a clear abuse of discretion. *City of Minneapolis v. Price*, 280 Minn. 429, 433, 159 N.W.2d 776, 780 (1968). A defendant must show prejudice to justify reversal. *In re Welfare of T.D.F.*, 258 N.W.2d 774, 775 (Minn. 1977). Here, defense counsel received the report thirteen days before the beginning of the defendant's case. While counsel was busy with the pre-trial *Spreigl* hearing and with the trial, still this is not the impossibly tight time schedule encountered in *T.D.F.*, where counsel for a juvenile learned of a hearing the afternoon it was scheduled to happen and this court held that denial of a continuance was an abuse of discretion. 258 N.W.2d at 774–75. *See also State v. Smith*, 367 N.W.2d 497, 503 (Minn.1985). Furthermore, the defense did not make an offer of proof of prejudice. Abuse of discretion was not established.

We hold that the presence of the state investigator during the defense expert's tests and the state's delay in disclosing the investigator's report did not violate the defendant's rights.

■ 2. The second question raised is whether the verdict was supported by the evidence. In reviewing the sufficiency of evidence, the court views the evidence in the light most favorable to the jury verdict. *State v. Daniels*, 380 N.W.2d 777, 781 (Minn.1986). The weight and credibility to be given to the testimony of individual witnesses is within the province of the jury. *Id.* Furthermore, the circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. *State v. Berndt*, 392 N.W.2d 876, 880 (Minn.1986), *cert. denied*, — U.S. —, 107 S.Ct. 909, 93 L.Ed.2d 859 (1987) quoting *State v. Jacobson*, 326 N.W.2d 663, 666 (Minn.1982).

■ With respect to intent, expert testimony indicated that the gun could not be made to discharge accidentally, and the angle of entry and the height of defendant's

armpit indicated that the gun was not under defendant's arm but was shoulder level, the position for intentional shooting. The presence of the gun in the living room, which the jury could have found from Tobi's testimony, would imply that defendant picked up the gun in order to use it rather than to get it out of the wet. These facts, and the history of defendant's violence with the women in his life, are sufficient to establish defendant's intent to kill beyond a reasonable doubt.

 With respect to premeditation, there is also sufficient evidence. Premeditation means to consider, plan or prepare for, or determine to commit, the act prior to its commission. Minn.Stat. § 609.18 (1984). Extensive planning is not required; the plan can be formulated virtually instantaneously. *State v. Neumann,* 262 N.W.2d 426, 430 (Minn.1978). In *State v. Austin,* 332 N.W.2d 21, 25 (Minn.1983), we held that a killing was premeditated where the defendant could have formed a plan between the time he saw the victim from the bottom of a flight of stairs and the time he reached the top of the stairs and shot. Here if defendant carried the gun from the living room outside, the time and the distance involved were not unlike *Austin,* and there was time to form the requisite plan. We hold the evidence was sufficient to support findings of intent and premeditation.

 3. The third and most difficult question is whether the trial court erred in admitting evidence of prior bad acts. At a *Spriegl* hearing before the trial, evidence was presented concerning incidents of violence by defendant toward other people. Without objection from the defense, the trial court took the matter under advisement, and did not rule finally on admissibility until the state had presented all other evidence.[1] At that time the court ruled six incidents admissible, five of them involving assaults on defendant's former wives. The trial court refused to admit other incidents that it found were not adequately supported by the evidence.

At the *Spreigl* hearing, Patricia Curran Rainer, defendant's third wife, testified that in 1982 when she came home from a meeting twenty minutes late, defendant asked to whom she had been talking and why she was late, then grabbed her by the neck, threw her on the bed, put his knee on her chest, pressed her throat and said "Woman, I will kill you" or "I will kill you, woman." Randy Lehner, defendant's second wife, testified that in 1974 when she and defendant were still living together, she stopped by defendant's service station and argued with the woman whom defendant had been seeing, and when the woman refused to leave, defendant pulled Lehner out of the station by her hair.

Maxine Rainer, defendant's first wife, testified to three incidents that occurred while she was married to defendant, an assault with a rifle, with a knife, and with a towel. Once in about 1965, when she was half an hour or an hour late back from shopping, defendant pushed her onto the bed, pointed a loaded rifle at her with his hand near the trigger, touched the barrel to her chest, and said that if she were late again, he would kill her. In 1966, in an argument he pushed her onto the bed and held a knife to her throat. And in 1966 or 1967, as she was getting ready to go out, he accused her of going to meet someone and wrapped a towel around her neck and started to strangle her. Howard Mockros, a friend of Maxine Rainer, testified that one time in 1968, after Maxine's divorce, when he was in the vicinity of her house, defendant arrived, yelled at him, then shot at or around him a number of times, at a distance of a car length or two, as Mockros stood there. Maxine Rainer described the same incident, with some variation between the two stories.

---

**1.** Though the comment to rule 11 of the Minnesota Rules of Criminal Procedure indicates that the trial court should determine at the omnibus hearing whether the *Spreigl* evidence is clear and convincing but may postpone the final decision on admissibility of the evidence until mid-trial when the strength of the prosecution's case can be determined, we find no error in this case in the trial court's delay in ruling as to which incidents had been proved by clear and convincing evidence where the defendant did not object to the procedure.

■ Admission of evidence of other crimes or bad acts (*Spreigl* evidence) is in the discretion of the trial court, and this court will not reverse unless an abuse of discretion is clearly shown. *State v. Doughman,* 384 N.W.2d 450, 454 (Minn. 1986). On the other hand, this court has held that when it is unclear whether *Spreigl* evidence is admissible, the accused is to be given the benefit of the doubt. *State v. Clark,* 293 N.W.2d 49, 52 (Minn. 1980); *State v. Dinneen,* 300 Minn. 354, 358, 220 N.W.2d 292, 295 (1974). For *Spreigl* evidence to be admissible the trial court must determine that there is clear and convincing evidence that the defendant participated in the crimes or bad acts, that the evidence is relevant and material to the state's case, and that the probative value of the evidence outweighs any potential for unfair prejudice. *State v. Doughman,* 384 N.W.2d at 454. Timely notice of *Spreigl* evidence must also be given. Minn.R. Crim.P. 7.02.

■ The trial court found clear and convincing evidence that defendant committed the acts alleged in these six incidents. In all six incidents there was eyewitness testimony, there was no rebutting testimony, and the identity of the participants was not in doubt. The inconsistencies in the two versions of the Mockros incident were trivial. There is adequate evidence to support the finding that the incidents admitted were proved by clear and convincing evidence.

Defendant claims that the incidents are not similar to the crime charged and that their only purpose is to create an impermissible inference that he has a general propensity to commit violent acts.

■ Evidence of other crimes or bad acts by a defendant is inadmissible to show that the defendant acted in conformity with them or had a propensity to commit violent crimes, but it is admissible for other purposes, such as to show intent, or absence of mistake or accident. Minn.R.Evid. 404(b); *State v. Diamond,* 308 Minn. 444, 448, 241 N.W.2d 95, 99 (1976). There must be some relationship in time, location, or modus operandi between the charged crime and the other acts; the greater the similarity of the other acts to the crimes charged, the greater the chance that the other acts are relevant. *State v. Matteson,* 287 N.W.2d 408, 411 (Minn.1979). This court has held, for example, that a wife's earlier threats against her husband, whom she later allegedly killed, were admissible to show intent and absence of mistake, *State v. Diamond,* 308 Minn. at 448, 241 N.W.2d at 99, and that a pattern of aggressive sexual behavior against women in the community by an accused rapist was admissible on the issue of consent, *State v. DeBaere,* 356 N.W.2d 301, 305 (Minn.1984). *See* Kuhns, *The Propensity to Misunderstand the Character of Specific Acts Evidence,* 66 Iowa L.R. 777, 782–84 (1981).

In the instant case we have incidents of past violence, each one toward a significant woman in defendant's life (or someone closely associated with her), out of jealousy or anger, presented to disprove defendant's assertion that the gun's discharge was an accident. This shows a repeating pattern of very similar conduct not merely a general propensity toward violence.

■ Defendant argues that the incidents are too old to be admissible. Admissibility may be upheld notwithstanding a lack of closeness in time or place if the relevance of the evidence is otherwise clear. *State v. DeBaere,* 356 N.W.2d at 305. Older incidents may become admissible when there are similar incidents in the intervening time. *State v. Bolts,* 288 N.W.2d 718, 719 (Minn.1980). The Maxine Rainer and Howard Mockros incidents were 16 to 19 years old at the time of the shooting of Forrest, the Randy Lehner incident was 10 years old, and the Patricia Curran Rainer incident was two years old. We have not dealt with *Spreigl* incidents of this age, but the court of appeals and courts of other jurisdictions have held that incidents of this age are admissible. Older incidents are generally admissible if there have been recent similar incidents as well.[2]

---

2. *Brewington v. State,* 702 S.W.2d 312, 313–15 (Tex.App.1986) (child sexual assault over a 22

Older incidents have sometimes been admitted even without similar intervening incidents.[3] We do not consider the 16–to–19–year-old incidents in this case too old to be admitted, given the intervening incidents, but even if there were error, we would find it harmless.

■ The prejudicial effect of the *Spreigl* incidents in this case is outweighed by their probative value. There is not the danger here that there was in *State v. Spreigl*, 272 Minn. 488, 495, 139 N.W.2d 167, 172 (1965), that the jury would punish the defendant for past acts even when it could not find the defendant guilty of the act charged. In addition an instruction was given before the testimony of each *Spreigl* witness limiting its use to the crime being tried.

■ We find no merit in defendant's argument that timely notice of the Howard Mockros incident was not given. Notice of additional (*Spreigl*) offenses is to be given at the omnibus hearing, or as soon thereafter as the offense is known to the prosecutor. Minn.R.Crim.P. 7.02. Here the notice of the Mockros incident was given on April 14, 1986, at the start of the *Spreigl* hearing. Timely notice was thus given. This was also seven days before the testimony at the *Spreigl* hearing concerning the Mockros incident, eight days before the beginning of the prosecution's case, and 16 days before the Mockros testimony at trial. This is not like the *Doughman* case, where there was no notice of a *Spreigl* offense until mid-trial and in fact there had been a specific pretrial ruling prohibiting introduction of the evidence. *State v. Doughman*, 384 N.W.2d 450, 455 (Minn.1986).

We hold that the trial court properly admitted evidence of prior bad acts.

4. Finally defendant argues that the trial court erred in refusing to grant a *Schwartz* hearing. After trial, defendant alleged two acts of jury misconduct: that the jury attempted to recreate the scene of the shooting by having a juror of defendant's size hold the gun, and that the jury experimented for more than two hours trying to get the gun to misfire. The trial court denied defendant's motion, holding that neither experiment went beyond the evidence elicited at trial.

■ The granting of a *Schwartz* hearing is generally a matter of discretion for the trial court. *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). The trial court should be liberal in granting a hearing, *Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 343, 191 N.W.2d 418, 425 (1971), but before a hearing is mandated the defendant must submit sufficient evidence which if unchallenged would warrant the conclusion of jury misconduct. *State v. Larson*, 281 N.W.2d at 484.

■ There are no Minnesota cases that deal with experiments conducted by the jury in the jury room. Cases from outside the jurisdiction indicate that experimentation with weapons in evidence and re-enactment of incidents by the jury are permissible. *State v. Thompson*, 164 Mont. 415, 423, 524 P.2d 1115, 1119 (1974); *State v. Ashworth*, 231 Kan. 623, 629, 647 P.2d 1281, 1287 (1982); *People v. Harris*, 84 A.D.2d 63, 105, 445 N.Y.S.2d 520, 546, 31

year period); *Potts v. State*, 427 So.2d 822, 823–25 (Fla.Dist.Ct.App.1983) (child sexual assault 1, 8, 12 and 18 years before); *State v. McCoy*, 400 N.W.2d 807, 809–10 (Minn.App.1987) (child sexual assault over the previous 5 or 6 years, and 11 and 14 years before); *State v. Lewis*, 385 N.W.2d 352, 354 (Minn.App.1986) (arson 5, 7, and 10 years before); *but see State v. Casady*, 392 N.W.2d 629, 633 (Minn.App.1986) (child sexual assault over the previous 8 years and 13 years before, 13-year-old incident not admissible).

3. *Heuring v. State*, 495 So.2d 893, 894 (Fla.App. 1896) (child sexual assault 20 years before, ad-

missible); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23, 28–30 (1986) (assault on former wife 10 years before when charged with murder of present wife, admissible); *Rossi v. State*, 416 So.2d 1166, 1167–68 (Fla.Dist.Ct.App.1982) (adult sexual assault 10 years before, admissible); *but see People v. Thomas*, 20 Cal.3d 457, 465–467, 573 P.2d 433, 436–438, 143 Cal.Rptr. 215, 217–220, (1978) (child sexual assault 10 to 18 years before, inadmissible); *Templin v. State*, 711 S.W.2d 30, 31–32 (Tex.Crim.App.1986) (childhood electrocution of animals 15 or 17 years before when charged with electrocution of wife, inadmissible).

A.L.R.4th 525, 560, *aff'd,* 57 N.Y.2d 335, 442 N.E.2d 1205, 456 N.Y.S.2d 694 (1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 803 (1983); *Allen v. State,* 141 Tex.Cr.R. 94, 97–98, 146 S.W.2d 384, 386 (1940). *See* Annotation, *Propriety of Juror's Tests or Experiments in Jury Room,* 31 A.L.R. 4th 566, 593–597 (1984). Defendant cites no cases holding to the contrary. In the case before us, the jury did not go beyond the evidence that was presented to them and did nothing improper. We hold that the trial court properly refused to grant a *Schwartz* hearing on alleged jury misconduct.

We affirm the judgment of conviction. Affirmed.